**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
-----------------------------------------X
                                          :      OPINION AND ORDER
In re MERRILL LYNCH & CO., INC.           :      02 MDL 1484(JFK)
RESEARCH REPORTS SECURITIES LITIGATION    :
                                          :         ___
-----------------------------------------X
```

This Document Relates To:

In re Merrill Lynch & Co., Inc. Shareholders Litigation,
No. 02 Civ. 5097 (JFK)


**APPEARANCES**


For Class Plaintiffs:

        BERGER & MONTAGUE, P.C.
        1622 Locust Street
        Philadelphia, PA 19103-6305
            Of Counsel:    Merrill Davidoff, Esq.
                              Lawrence Lederer, Esq.
                              Lane Vines, Esq.
                              Robert Finkel, Esq.


For Defendants:

        FOLEY & LARDNER
        90 Park Avenue
        New York, New York 10016
            Of Counsel:    Marc Dorfman, Esq.

        SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP
        Four Times Square
        New York, New York 10036
            Of Counsel:    Jay Kasner, Esq.
                              Scott Musoff, Esq.
                              Joanne Gaboriault, Esq.


**JOHN F. KEENAN, United States District Judge.**

**JOHN F. KEENAN, United States District Judge:**

This Opinion considers the petition of the lead plaintiff for class certification and final approval of a proposed settlement and plan of allocation in a consolidated putative securities class action brought on behalf of shareholders of Merrill Lynch stock who claim to have incurred financial losses as a result of Merrill Lynch's issuance of allegedly fraudulent research reports. The Court also considers Lead Counsel's application for an award of attorneys' fees and reimbursement of litigation expenses. For the reasons that follow, the Court (i) grants class certification to the settling plaintiffs, (ii) approves the settlement and plan of allocation, (iii) awards attorneys' fees in the amount of 15% of the settlement fund, and (iv) awards reimbursement of litigation expenses to counsel.

## BACKGROUND

This securities class action (the "Action") was among numerous lawsuits brought against Merrill Lynch in the wake of a highly publicized investigation by the Office of the New York Attorney General (the "NYAG") in which Merrill Lynch was alleged to have published fraudulent research reports on various Internet-based companies. Although the majority of the putative class actions were brought on behalf of classes of direct purchasers of stock in the companies that were the subject of

allegedly false research reports, and on behalf of purchasers of
Merrill Lynch's proprietary mutual funds that contained the
stocks of the Internet-based companies, this Action differs in
that it was asserted on behalf of purchasers of stock in Merrill
Lynch itself.

The cases originally were assigned to the late
Honorable Milton J. Pollack for pre-trial purposes, in In re
Merrill Lynch & Co., Inc. Research Reports Sec. Litig., 02 MDL
1484, pursuant to an order of the Judicial Panel on Multidistrict
Litigation ("MDL") which consolidated before Judge Pollack
numerous claims, alleging securities fraud against Merrill Lynch
and other defendants.  The cases were reassigned to me upon Judge
Pollack's death.  This is the third global settlement of the
cases consolidated under this MDL.  The first global settlement
involved three consolidated cases, relating to claims brought on
behalf of shareholders of three different Merrill Lynch
proprietary mutual funds (the "Mutual Fund Cases"), and was
approved by this Court on February 1, 2007. See In re Merrill
Lynch & Co., Inc. Research Reports Sec. Litig., 02 MDL 1484
(JFK), 2007 U.S. Dist. LEXIS 9450 (S.D.N.Y. Feb. 1, 2007) (the
"MF Decision").  The second global settlement involved twenty
consolidated cases, relating to claims brought on behalf of
direct purchasers of stock in the Internet-based companies that
were the subjects of Merrill Lynch's allegedly fraudulent reports

(the "Internet Cases"), and was approved by the Court on September 5, 2007. See In re Merrill Lynch & Co. Research Reports Sec. Litig., 02 MDL, 1484, 2007 U.S. Dist. LEXIS 65372 (S.D.N.Y. Sept. 5, 2007) (the "Internet Cases Decision").

Lead Plaintiff in this Action has brought claims on behalf of investors who purchased Merrill Lynch stock from July 3, 1999 through April 8, 2002, held the stock until April 8, 2002 or afterward, and incurred financial losses as a result. Defendants are Merrill Lynch & Co., Inc.; Merrill Lynch, Pierce, Fenner & Smith Incorporated ("MLPF&S"), Merrill Lynch's broker-dealer affiliate; and Henry Blodgett, a Merrill Lynch vice president and the primary research analyst for companies in the Internet sector. Plaintiff alleged that Merrill Lynch's research analysts gave materially misleading favorable ratings to a number of Internet-based stocks in order to generate business for Merrill Lynch's investment banking operation. Plaintiff asserted claims of securities fraud under sections 10(b) and 20(a) of the Exchange Act of 1934 and Rule 10b-5. The factual background of the Actions and the plaintiffs' claims are set forth in previous decisions and orders of Judge Pollack, including In re Merrill Lynch & Co. Research Reports Sec. Litig., 272 F. Supp. 2d 243 (S.D.N.Y. 2003) and In re Merrill Lynch & Co. Research Reports Sec. Litig., 289 F. Supp. 2d 429 (S.D.N.Y. 2003); in Judge Pollack's decision and order in a related class action case, In

4

re Merrill Lynch & Co. Research Reports Sec. Litig., 273 F. Supp.
2d 351 (S.D.N.Y. 2003); in the MF Decision; and in the Internet
Cases Decision.  Familiarity with those decisions is assumed.

*Procedural History*

On April 8, 2002, the NYAG made public its
investigation into the dissemination of allegedly fraudulent
research reports on numerous internet securities by Merrill
Lynch.  In May 2002, Merrill Lynch entered into a widely
publicized cash settlement with the NYAG, in which Merrill Lynch
agreed to pay a fine of $100 million and reform its investment
counseling practices.  Soon after, over 150 actions were filed
against Merrill Lynch nationwide on behalf of purchasers of
approximately two dozen internet securities that had been the
subject of allegedly false or misleading research reports and
purchasers of Merrill Lynch's proprietary mutual funds that
contained the Internet-based securities at issue.

This action commenced in July 2002 with the filing of
the first of several class action complaints in this Court, by
putative class representative Doris Loder, on behalf of herself
and other similarly situated shareholders of Merrill Lynch's
stock.  In December 2002, the related class actions were
consolidated under the caption of the instant case.  In February
2003, J. Marvin Brown was appointed Lead Plaintiff and the firm
Berger & Montague was appointed Lead Counsel.  In March 2003,

Lead Plaintiff filed a consolidated amended class complaint. The complaint alleged, among other things, that Merrill Lynch's public statements filed with the SEC for the years 1999, 2000, and 2001 fraudulently failed to disclose that Merrill Lynch had issued falsely optimistic research reports for various internet companies in order to attract new investment banking business. As a result of Merrill Lynch's failure to disclose the falsely optimistic nature of its research, and the conflict of interest between Merrill Lynch's brokerage and investment banking divisions, Merrill Lynch's stock became artificially inflated. Plaintiff alleged that, as a result of the revelation to the public of the NYAG's investigation on April 8, 2002, Merrill Lynch's stock price declined, resulting in financial losses to shareholders of Merrill Lynch's stock.

On June 30, 2003, Judge Pollack dismissed with prejudice the complaints in two test cases[1] (the "Test Cases") brought on behalf of direct purchasers of Merrill Lynch-recommended securities on the grounds, <u>inter alia</u>, that the plaintiffs had failed adequately to plead loss causation; that the plaintiffs had failed to plead fraud with sufficient particularity; and that the complaints were untimely, because the

---

[1] <u>In re Merrill Lynch 24/7 Real Media Inc. Research Reports Sec. Litig.</u> No. 02 Civ. 3210 (MP), and <u>In re Merrill Lynch Interliant Inc. Research Reports Sec. Litig.</u>, No. 02 Civ. 3221 (MP)

plaintiffs had been put on inquiry notice more than one year before the commencement of the actions. See In re Merrill Lynch & Co. Research Reports Sec. Litig., 273 F. Supp. 2d 351 (S.D.N.Y. 2003). In October and November 2003, Judge Pollack dismissed additional consolidated actions brought on behalf of direct purchasers of stock in the Internet-based companies, on the ground of loss causation. Motions to dismiss other actions were then stayed pending the Second Circuit's adjudication of the appeals of the dismissals of the Test Cases.

On October 6, 2004, following Judge Pollack's death, the Judicial Panel for Multidistrict Litigation reassigned the cases consolidated in In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig., 02 MDL 1484, including this Action, to me.

On January 20, 2005, the Second Circuit issued its decision in the appeal of Judge Pollack's dismissal-with-prejudice of the Test Cases. In Lentell v. Merrill Lynch, 396 F.3d 161 (2d Cir. 2005), cert. denied, 126 S. Ct. 421 (2005), the Circuit affirmed Judge Pollack's dismissal on the ground of loss causation. Id. at 178. In addition, following the Lentell decision, the Second Circuit affirmed dismissals of what counsel in this Action characterize as "similar claims against brokerage firms." (Mem. of Law in Support of Lead Pl. Mot. for Final Approval of Class Action Settlement ("Pl. Mem. Settle."), at 4.). Specifically, the Second Circuit affirmed the dismissal of

7

securities fraud claims in two cases, on the grounds that the
action was barred by the statute of limitations, see Shah v.
Meeker, 435 F.3d 244 (2d Cir. 2006)("Citigroup") and lack of
sufficient pleading of scienter, see Albert Fadem Trust v.
Citigroup, Inc., No. 4-5642-cv, 2006 US App. LEXIS 2997 (2d Cir.
Feb. 6, 2006)("Morgan Stanley").

*The Settlement*

        Settlement discussions in this case began in December
2005, nearly a year after the Circuit's decision in Lentell.
According to Lead Counsel, the parties "conducted multiple
meetings in person and telephonically. . . ." over the course of
several weeks. (Pl. Mem. Settle. at 3.)  The parties eventually
reached a preliminary agreement on a settlement of $15 million,
plus interest on that amount to accrue as of January 1, 2007 and
to continue to accrue until the settlement is paid out to the
class.  The agreement also called for the defendants to pay all
costs of notice and administration of the settlement.

        After reaching their preliminary agreement, the parties
negotiated terms of the Stipulation of Settlement
("Stipulation").  On June 5, 2007, the parties executed the
Stipulation.  On June 20, 2007, the Court issued a Preliminary
Order in Connection with Settlement Proceedings ("Preliminary
Order"), which among other things granted preliminary
certification to the settlement class; set forth the deadlines

for notice to potential class members and the filing of objections and requests for exclusion; set the date of a hearing to determine the fairness of the proposed settlement; appointed a claims administrator to administer settlement proceeds and disseminate notice of settlement to potential class members; and approved the form and substance of the proposed notice of settlement and the proof of claim and release form.

The Stipulation provided for a cash payment in the amount of $15 million, plus interest imputed monthly on the amount of $15 million, beginning on January 1, 2007 and to continue accruing until the settlement is paid to the class, at the three-month London Offered Interbank Rate ("LIBOR") listed in the <u>Wall Street Journal</u> at the close of each month ("Settlement Fund").[2]  The Settlement Class consists of persons who acquired Merrill Lynch stock between July 3, 1999 and April 8, 2002 (the date the NYAG's investigation became public) and suffered damages as a result.  In addition to payment of the Settlement Fund, the defendants, pursuant to the Stipulation, are required to pay for the cost of providing notice of the settlement and with the cost of administering the settlement.[3]

---

[2] As of December 7, 2007, interest of approximately $753,288 had accrued.

[3] As of December 7, 2007, the total of the costs and expenses for notice and claims administration was $975,240.52.

Pursuant to the Stipulation, the Settlement Fund will be used to pay taxes and tax expenses, attorneys' fees, and litigation expenses. The remaining amount of the Settlement Fund ("Net Settlement Fund") then will be distributed to valid claimants pursuant to the Plan of Allocation. The Stipulation also contains a release and waiver, barring any participating Class Members from bringing against the defendants any future claims, known or unknown, that arise out of or relate to this Action.

*Notice to Class*

On July 9, 2007, pursuant to the Preliminary Order, counsel, through the Court-approved claims administrator, Heffler, Radetich & Saitta, L.L.P. ("HR&S") began the process of mailing notice of the settlement to identifiable class members. Through October 19, 2007, HR&S mailed a total of 522,832 notices. In addition, on July 20, 2007, summary notices describing the settlement were published in The Wall Street Journal and electronically via the PR News wire. HR&S also posted downloadable copies of the Notice and proof of claim form on its website (http://www.hrsclaimsadministration.com) (last visited December 10, 2007).

The Notice provided a background of the Actions, described the circumstances leading up to the Settlement, supplied the details of the Settlement, gave notice of the

Fairness Hearing, and provided instructions for Class Members regarding submissions of claims, exclusion from the Settlement, objection to the terms of Settlement and/or the application for attorneys' fees and reimbursement of expenses, and attendance at the Fairness Hearing.  The Notice also stated that Lead Counsel would apply for attorneys' fees not to exceed 22.5% of the Settlement Fund, and reimbursement of attorneys' costs and expenses incurred in connection with the litigation of the Actions not to exceed $125,000.

*Plan of Allocation*

The Notice included the proposed Plan of Allocation. The Notice explained that, under the Plan of Allocation, the Net Settlement Fund will be distributed on a <u>pro rata</u> basis to Class Members based on their relative applicable losses in Merrill Lynch's stock, who submit timely, valid Proof of Claim forms. Class Members who purchased Merrill Lynch's stock between July 3, 1999 and April 8, 2002 above the price of $50.02 per share and who held the stock at least through the end of the Class Period are eligible to share in the recovery.  According to Lead Plaintiff's damages expert, Dr. Steven Feinstein of the Michael Shaked Group, the estimated recovery per share is $0.545, which represents between 2.15% and 4.07% of the estimated damages.

*Reaction of Class to the Notice of Proposed Settlement*

The response of the classes to the proposed settlement has been highly favorable. After mailing over 522,000 Notices to potential Class Members, as of October 18, 2007, HR&S received only 59 requests for exclusion. As of November 5, 2007, the date of the Fairness Hearing, only six individual investors and no institutional investors had filed objections to either the settlement or the request for an award of attorneys' fees and reimbursement of expenses. As discussed below, those objections are meritless.

*Fairness Hearing*

Lead Counsel and Liaison Counsel[4] have submitted a Motion in Support of Final Approval of Class Action Settlement, a Motion for an Award of Attorneys' Fees and Reimbursement of Expenses, and accompanying memoranda and exhibits. The defendants have not submitted any memoranda. A Fairness Hearing was held on November 5, 2007. Lead Counsel addressed the Court in support of the fairness of the proposed Settlement and Plan of Allocation, and in support of the application for attorneys' fees of 22.5% of the Settlement Fund. Counsel for Merrill Lynch appeared at the Hearing, spoke briefly in favor of approval of the proposed Settlement as fair and reasonable, but took no position on Lead

---

[4]Liaison Counsel is the firm Wolf Popper LLP.

Counsel's application for attorneys' fees.  No Objectors attended
the Hearing.

**DISCUSSION**

*(i) Certification of the Settlement Class*

The Stipulation contemplates certification of the
settlement class.  "Before certification is proper for any
purpose–settlement, litigation, or otherwise–a court must ensure
that the requirements of Rule 23(a) and (b) have been met."
Denny v. Deutsche Bank, A.G., 443 F.3d 253, 270 (2d Cir. 2006).
Rule 23(a) imposes four threshold requirements on putative class
actions:  numerosity, commonality, typicality, and adequacy of
representation.  Id. at 267.  In addition, Rule 23(b)(3) imposes
the following two requirements:  "Common questions must
'predominate over any questions affecting only individual
members'; and class resolution must be 'superior to other
available methods for the fair and efficient adjudication of the
controversy.'"  Id. (quoting Fed. R. Civ. P. 23(b)(3)).  The Court
considers each requirement in turn.

*Numerosity*

Rule 23(a)(1) requires that the putative class be "so
numerous that joinder of all class members is impracticable."
Fed. R. Civ. P. 23(a)(1).  While no minimum number of plaintiffs
is required for a suit to be maintained as a class action,

"[g]enerally, courts will find a class sufficiently numerous when it comprises 40 or more members." DeMarco v. Nat'l Collector's Mint, Inc., 229 F.R.D. 73, 80 (S.D.N.Y. 2005) (citation and internal quotations omitted).  Here, HR&S identified more than 522,000 potential Class Members.  At the Fairness Hearing, Lead Counsel informed the Court that, as of November 5, 2007, approximately 89,000 claims had been filed.  The settlement class in this Action is clearly so large that it would not be possible for individual investors to bring their claims separately.  The numerosity requirement therefore is satisfied.

*Commonality*

Under Rule 23(a)(2), class certification is appropriate where "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2).  The commonality requirement of Rule 23(a)(2) is satisfied if "all class members are in a substantially identical factual situation and the questions of law raised by the plaintiff[s] are applicable to each class member." In re Playmobil Antitrust Litig., 35 F. Supp. 2d 231, 240 (E.D.N.Y. 1998).  The rule does not require that every question of law or fact be common to each class member. Id.  "The commonality requirement has been applied permissively in the context of securities fraud litigation." In re Veeco Instruments, Inc., Sec. Litig., 235 F.R.D. 220, 238 (S.D.N.Y. 2006).  Here, the Action raises questions of law and fact that are common to

each class member.  Plaintiffs are suing under the same federal securities laws, alleging the same misrepresentations and/or omissions of material statements in the Merrill Lynch research reports, and alleging that the misrepresentations resulted ultimately in the decline in value of their shares of Merrill Lynch stock.  Thus, "the success of each plaintiff's claim turns on establishing the existence, nature and significance of the same alleged misrepresentations and omissions." Id.  The commonality requirement is satisfied.

*Typicality*

Rule 23(a)(3) is satisfied if "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3).  The "typicality" requirement is met where "the claims of the named plaintiffs arise from the same practice or course of conduct that gives rise to the claims of the proposed class members." Schwab v. Philip Morris USA, Inc., 449 F. Supp. 2d 992, 1104 (E.D.N.Y. 2006) (internal quotations and citation omitted).  Here, there is no indication that the claims of the Lead Plaintiff differ in any respect from the claims of the rest of the putative Class Members.  Thus, the typicality requirement is satisfied.

*Adequacy of Representation*

Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). This necessitates a two-part inquiry: (1) whether the lead plaintiffs' interests are antagonistic to the interests of other members of the class, and (2) whether plaintiffs' attorneys are qualified, experienced and able to conduct the litigation. Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp., 222 F.3d 52, 60 (2d Cir. 2000). Regarding the first prong, there is no indication that the Lead Plaintiff's claims are potentially at odds in any way with the claims of unnamed Class Members. As stated above, the claims of the Lead Plaintiff appear to be typical of the claims of the remainder of the class. The second prong also is satisfied. As the resumes submitted by Lead Counsel and Liaison Counsel clearly demonstrate, counsel have wide experience in the field of securities class litigation. Further, as discussed below and as is clear from the record of this litigation, counsels' able representation enabled the Class Members to obtain a favorable and certain cash recovery. Thus, the final requirement of Rule 23(a) has been met.

*Rule 23(b)(3): Predomination and Superiority*

Rule 23(b)(3) requires "[1] that common questions of law or fact predominate over individual questions and [2] that a class action is superior to other methods of adjudication." In re Veeco Instruments, Inc., 235 F.R.D. at 240. "In determining

whether common questions of fact predominate, a court's inquiry is directed primarily toward whether the issue of liability is common to members of the class." In re Blech Sec. Litig., 187 F.R.D. 97, 107 (S.D.N.Y. 1999). Common questions also predominate where "even if each Class member were to bring an individual action, each would be required to prove the existence of the alleged activities of the defendants in order to prove liability." Id. Here, only the issue of damages will be different for each Class Member, depending upon the number of Merrill Lynch shares for which the Class Member can claim a loss. Further, as discussed above, the Class Members' claims involve the same questions of fact and law. Thus, even if each Class Member in each Action were to bring suit individually, each plaintiff would have to allege and prove virtually identical facts. Therefore, common questions predominate.

Rule 23(b)(3) sets forth the following factors to be considered in making a determination of superiority: "(A) The interest of members of the class in individually controlling the prosecution . . . of separate actions; (B) The extent and nature of any litigation concerning the controversy already commenced by . . . members of the class; (C) The desirability . . . of concentrating the litigation of the claims in the particular forum; and (D) The difficulties likely to be encountered in the management of a

class action." Fed. R. Civ. P. 23(b)(3).  As the court

observed in <u>In re Blech Sec. Litig.</u>,

> In general, securities suits . . . easily satisfy the
> superiority requirement of Rule 23.  Most violations of
> the federal securities laws . . . inflict economic injury
> on large numbers of geographically dispersed persons such
> that the cost of pursuing individual litigation to seek
> recovery is often not feasible.  Multiple lawsuits would
> be costly and inefficient, and the exclusion of class
> members who cannot afford separate representation would
> neither be 'fair' nor an adjudication of their claims.
> Moreover, although a large number of individuals may have
> been injured, no one person may have been damaged to a
> degree which would induce him to institute litigation
> solely on his own behalf.

187 F.R.D. at 107.

The reasoning of the court in <u>Blech</u> applies in

this Action, where approximately 88,000 shareholders have

filed proofs of claim and the expected recovery per share is

low.  Because of the large number of potential claimants and

the relatively small damage suffered by potential individual

claimants, it is unlikely that individual plaintiffs would

endure the expense of litigation in order to bring their

claims.  There is no indication that counsel are likely to

encounter any difficulties in administering the settlement

of the actions.  Therefore, because class action treatment

is superior to any other method for the fair and efficient

adjudication of these Actions, the requirements of Rule

23(b)(3) are satisfied.

Because the factors for class certification set forth in Rule 23(a) and Rule 23(b)(3) have been met, the application to certify the classes for settlement is granted.

## (ii) Approval of Final Settlement

Federal Rule 23(e) governs the settlement of class actions and requires court approval before a settlement is executed. Adequate notice of the proposed settlement must be provided and the proposed settlement must be the subject of a fairness hearing. Fed. R. Civ. P. 23(e)(1). In addition, a court may approve a settlement that is binding on the class only if it determines that the settlement is "fair, adequate, and reasonable" and not a "product of collusion." Joel A. v. Giuliani, 218 F.3d 132, 138 (2d Cir. 2000). This evaluation requires the court to consider both "the settlement's terms and the negotiating process leading to settlement." Wal-Mart Stores, Inc. v. Visa U.S.A. Inc., 396 F.3d 96, 116 (2d Cir. 2005). The determination of the fairness of a settlement is a matter addressed to the Court's discretion. Joel A., 218 F.3d at 139.

### Adequacy of Notice

While there are no rigid rules to determine the adequacy of notice in a class action, the standard is generally that of reasonableness. Wal-Mart, 396 F.3d at

113-14. Notice need not be perfect, but need be only the best notice practicable under the circumstances, and each and every class member need not receive actual notice, so long as class counsel acted reasonably in choosing the means likely to inform potential class members. <u>Weigner v. City of New York</u>, 852 F.2d 646, 649 (2d Cir. 1988). Notice is generally deemed reasonable if the average person understands the terms of the proposed settlement and the options provided to class members thereunder. <u>Wal-Mart</u>, 396 F.3d at 114.

In this Action, counsel provided potential Class Members with adequate notice of the Settlement. Counsel, through a Court-approved claims administrator, disseminated the Notice to more than 522,000 potential claimants. In plain language that is easily understood by the average person, the Notice set forth essential information, including the background of the Actions, the terms of the Settlement, the Plan of Allocation, and the various rights of Class Members under the Settlement (including the right to opt out, file objections, and attend the Fairness Hearing). Appended to each Notice was a form for Proof of Claim and Release, which contained detailed instructions for filing claims under the Settlement. Counsel also complied with the publication requirement, causing the Summary Notice

to be published in the appropriate print and online
publications.  The Summary Notice contained the required
information regarding the Settlement terms and process and
provided clear instructions on how potential claimants could
obtain a copy of the Notice and Proof of Claim.  The Court
finds that Notice of the proposed settlement of the Actions
was reasonable.

*Procedural Fairness*

        "A 'presumption of fairness, adequacy, and
reasonableness may attach to a class settlement reached in
arm's-length negotiations between experienced, capable
counsel after meaningful discovery.'" Wal-Mart, 396 F.3d at
116 (quoting Manual for Complex Litigation, Third, § 30.42
(1995)).  "'The experience of counsel, the vigor with which
the case was prosecuted, and the coercion or collusion that
may have marred the negotiations themselves' shed light on
the fairness of the negotiating process." Hicks v. Morgan
Stanley & Co., No. 01 Civ. 10071, 2005 U.S. Dist. LEXIS
24890, at *13 (S.D.N.Y. Oct. 24, 2005) (quoting Malchman v.
Davis, 706 F.2d 426, 433 (2d Cir. 1983)).

        The negotiations leading to the Settlement were
procedurally fair.  There is no reason not to credit Lead
Counsel's representation that "[t]he proposed Settlement was
negotiated at arm's length and over many months in multiple

negotiations." (Decl. Of Merrill G. Davidoff in Support of Lead Plaintiffs' Mot. for Final Approval of Class Action Settlement and Lead Counsel's Mot. for an Award of Attorneys Fees and Reimbursement of Expenses ("Davidoff Decl.") ¶ 4.) The parties began settlement discussions in December 2005. Initial negotiations consisted of several in-person and telephonic conversations and transpired over the course of several weeks. In July 2006, Lead Counsel submitted a letter to Merrill Lynch that contained key terms of a proposed settlement. After the parties exchanged several drafts of a proposed stipulation of settlement, and after Lead Counsel devised a proposed Plan of Allocation in conjunction with their retained damages expert, the parties executed the Stipulation in June 2007. In sum, counsel with wide experience and demonstrated skill in the field of class action securities litigation represented both sides in reaching the Stipulation after arm's length negotiations. There is nothing in the record of this case to challenge the presumption of procedural fairness that attaches to the negotiation process. The Court thus finds that the process by which the parties negotiated the proposed settlement was fair and reasonable.

_Substantive Fairness_

Courts of the Second Circuit examine the well-established "Grinnell factors" to determine whether a settlement is substantively fair and reasonable as required by Rule 23(e). The factors that a district court considers are:

> (1) the complexity, expense and likely duration of the litigation, (2) the reaction of the class to the settlement, (3) the stage of the proceedings and the amount of discovery completed, (4) the risks of establishing liability, (5) the risks of establishing damages, (6) the risks of maintaining the class action through the trial, (7) the ability of the defendants to withstand a greater judgment, (8) the range of reasonableness of the settlement fund in light of the best possible recovery, (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation[.]

D'Amato v. Deutsche Bank, 236 F.3d 78, 86 (2d Cir. 2001) (citing City of Detroit v. Grinnell Corp., 495 F.2d 448, 463, abrogated on other grounds by Goldberger v. Integrated Reserves, Inc., 209 F.3d 43 (2d Cir. 2000)). A court need not find that every factor militates in favor of a finding of fairness; rather, a court "consider[s] the totality of these factors in light of the particular circumstances." In re Global Crossing Sec. & ERISA Litig., 225 F.R.D. 436, 456 (S.D.N.Y. 2004).

Application of the Grinnell factors in this Action leads ineluctably to the same conclusion that this Court reached in the MF Decision and the Internet Cases Decision: namely, that given the dire procedural posture of the

23

litigation, "[t]here is little question that the settlement agreements . . . are fair and adequate to the class because they would provide what further litigation could not—any recovery for class members." In re Stock Exchs. Options Trading Antitrust Litig., No. 99 Civ. 0962, 2006 U.S. Dist. LEXIS 87825, at *26 (S.D.N.Y. Dec. 4, 2006) (internal quotations and citation omitted)).   In this case, as in the settlements of the Mutual Fund Cases and the Internet Cases the factors that weigh most heavily in favor approval of the settlement are:  the reaction of prospective class members to the proposed settlement; the risks involved in establishing liability and damages; and the range of reasonableness of the litigation, in light of the attendant risks of litigation.

       The reaction of the class has been very positive. After more than 522,000 notices were sent to identifiable potential class members, only 59 potential claimants requested exclusion and only six objections to the Settlement were received.  "If only a small number of objections are received, that fact can be viewed as indicative of the adequacy of the settlement." Wal-Mart, 396 F.3d at 118.  Here, the minimal number of objections and requests for exclusion militates in favor of finding the settlement to be fair, adequate, and reasonable. See, e.g.,

McBean v. City of New York, 233 F.R.D. 377, 386 (S.D.N.Y. 2006) (approving settlement where, after notice was sent to 40,352 class members, only four objected and 36 opted out of settlement); Hicks, 2005 U.S. Dist. LEXIS 24890, at *16 (finding that reaction of class supported approval, where 123 class members out of approximately 100,000 requested exclusion and only three filed objections); D'Amato v. Deutsche Bank, 236 F.3d 78, 87 (2d Cir. 2001) (approving settlement where 18 objections were filed after notice was sent to 27,883 class members).

The high risk of going forward with this case and attempting to prove liability and establish damages weighs most heavily in favor of approving the Settlement. At the time the parties executed the Stipulation, the Second Circuit had affirmed Judge Pollack's dismissal-with-prejudice of the Test Cases on loss causation grounds. In addition, as counsel point out, the Second Circuit also affirmed dismissals of the complaints in two similar securities class actions against brokerage firms on the ground of the statute of limitations, in Citigroup, and on the ground of failure to adequately plead scienter, in Morgan Stanley. Counsel contend that the grounds for dismissal asserted in Citigroup and Morgan Stanley arguably also would have prevailed in this case. Thus, given the

25

Circuit's rulings in <u>Lentell</u>, <u>Citigroup</u>, and <u>Morgan Stanley</u>, the alternative to settlement in this action was almost certain non-recovery by the class members.

Similarly, the reasonableness of the settlement, in light of the risk faced by the plaintiffs in going forward, militates in favor of approval. Here, the Settlement Fund will amount to $15 million, plus interest, representing a certain cash recovery for the class. The alternative, as noted above, was the very high risk of complete non-recovery. Counsel state that, according to Lead Counsel's damages expert, the estimated recovery of $0.545 per share provided by the settlement represents between 2.15% and 4.07% of estimated damages. The estimated recovery falls within the range of reasonableness for settlements of securities class actions. <u>See</u> <u>Hicks</u>, 2005 U.S. Dist. LEXIS 24890, at *19 (finding a settlement representing 3.8% of plaintiffs' estimated damages to be within range of reasonableness). In sum, after considering the relevant <u>Grinnell</u> factors, the Court finds that the Settlement is substantively fair and reasonable.

*Objections to Settlement*

Six objections to the settlement have been received, one of which was subsequently withdrawn. The Objectors are individual investors. All of the objections

were filed by individuals.  No Objector attended the Fairness Hearing.  Lead Counsel replied by letter to five of the six objections and have provided the Court with copies of the responsive letters.

Each objection is addressed in turn.

*James O'Keane*:  Mr. O'Keane objects that the Settlement, which provides "less than a nickel a share" to class members is neither adequate nor fair.  Mr. O'Keane states that he purchased Merrill Lynch shares in August 2001, that he continues to own those shares, and that he would rather see the instant lawsuit dismissed than have the company in which he has invested dissipate its assets "in settling frivolous litigation."  As counsel point out, the objection ignores the fact that, as discussed above, the benefit to the class is considerable in light of the risk faced by plaintiffs that they would recover nothing were the litigation to proceed.

*Anna Whitley*:  Ms. Whitley objects that the settlement amount of $15 million is inadequate in light of the total damages incurred by Merrill Lynch stockholders and is insufficient to deter Merrill Lynch from committing future misconduct.  As counsel note, the objection does not consider the various factors that must be examined to ensure that a settlement is fair, such as the reasonableness of the

settlement in light of the risks of proceeding with litigation. In any event, counsel represent that Ms. Whitley "appears to have withdrawn her objection." (Pl. Mem. Settle. at 23.)

_Brian Maule_: Mr. Maule, as a successor trustee of the John Newton Merrick and Amanda Dickson Merrick Trust (which owned Merrill Lynch stock during the class period), objects primarily to the request for attorneys' fees. This objection is discussed below.

_Howard Weinreich_: Mr. Weinreich states that he purchased shares of Merrill Lynch in May 2001 and sold those shares in July 2001 and September 2001, at losses. Mr. Weinreich objects that he is not included in the class period. As counsel have explained to Mr. Weinreich in a letter responding to his objection, investors who sold their stock prior to April 8, 2002 are ineligible to recover because they could not prove loss causation. This is because Merril Lynch's alleged misconduct was made public on April 8, 2002, when the NYAG announced its investigation. Plaintiffs' theory is that the public revelation of the alleged fraud caused investors' losses. An investor who sold shares prior to April 8, 2002, therefore, cannot be said to have been harmed by the company's alleged misconduct.

*Harvey Helman*: Mr. Helman asks that either (i) he be made a class member or (ii) the Court "throw out the class action" on the ground that it is designed to "eliminate as many members of this class action as possible." As counsel note, without proof that Mr. Helman purchased and retained Merrill Lynch shares during the class period, Mr. Helman cannot be deemed a class member. Counsel have written to Mr. Helman and offered him advice and assistance on how he may obtain documentation of his trades in Merrill Lynch stock during the applicable class period.

*Richard Crouch*: Mr. Crouch objects to the fact that the Plan of Allocation requires that the minimum claim to be paid is $50. Counsel respond that a minimum cut-off amount is required to "efficiently administer and distribute the Settlement proceeds." (Pl. Mem. Settle. at 24.) As counsel correctly note, courts have approved minimum payouts in class action settlements in order to foster the efficient administration of the settlement. See, e.g., In re Global Crossing, 225 F.R.D. at 463 ("Counsel acted reasonably in including a $ 10 de minimis threshold in the allocation plan, in order to preserve the settlement fund from excessive and unnecessary expenses in the overall interests of the class as a whole.")

In sum, the few objections received do not weigh

29

against approval of the proposed Settlement as fair and reasonable.

*Plan of Allocation*

_____ "In approving an allocation plan, the Court must ensure that the distribution of funds is fair and reasonable." Hicks, 2005 U.S. Dist. LEXIS 24890, at *19-20 (citations omitted).  A plan of allocation that is devised by competent and experienced class counsel "need have only a reasonable, rational basis." Id. (internal quotations and citation omitted).

        The Plan of Allocation was developed by Lead Counsel in conjunction with a retained damages expert, Dr. Steven Feinstein of the Michael Shaked Group.  The Plan of Allocation calls for the Settlement Fund to be distributed to Class Members on the basis of each Class Member's pro rata loss of value in his or her shares of Merrill Lynch that were purchased above the price of $50.02 per share and held through the end of the Class Period.   Where, as here, a plan of allocation calls for the pro rata distribution of settlement proceeds on the basis of investment loss, the plan is reasonable. See MF Decision, at *39-40; Hicks, 2005 U.S. Dist. LEXIS 24890, at *21 (citing In re Global Crossing, 225 F.R.D. at 462).  Further, the Court notes that the Plan of Allocation was described in detail in the Notice

that was sent to each potential class member, and as
discussed above, the sole objection to the Plan, filed by
Mr. Richard Crouch, has no merit. Accordingly, the Court
approves the Plan of Allocation as fair and reasonable.

In sum, the Court approves the Settlement and the
Plan of Allocation as fair and reasonable.

### (iii) Attorneys' Fees

Counsel request 22.5% of the Settlement Fund. As
of December 7, 2007, the Settlement Fund, including accrued
interest, amounted to approximately $15,753,288. Thus, as
of December 7, 2007, the percentage requested by counsel
translates to a request for fees in the amount of
approximately $3,544,490. As of December 7, 2007, Lead
Counsel and Liaison Counsel expended a total of 2496.9 hours
on this litigation, for aggregate billable charges, or a
"lodestar", of $1,169,360. The request for attorneys' fees
therefore converts to a multiple of approximately 3.03 of
counsels' aggregate "lodestar". The requested percentage,
if granted, would award counsel an hourly rate of
approximately $1,420 for the 2496.9 hours of professional
and paraprofessional work expended in this litigation.
Although the requested percentage comports with the terms of
the Notice that was provided to potential class claimants
(which stated that counsel could request up to 22.5% of the

Settlement Fund), counsels' request must be modified to yield a reasonable fee.

*Legal Standard*

A federal district court has broad discretion to award attorneys' fees. Goldberger v. Integrated Resources, Inc., 209 F.3d 43, 47 (2d Cir. 2000). The trend in the Second Circuit has been to express the attorneys' fees as a percentage of the total settlement, rather than to use "lodestar" method to arrive at a reasonable fee.[5] Wal-Mart Stores, Inc. v. Visa U.S.A., Inc., 396 F.3d 96, 121 (2d Cir. 2005). What percentage is reasonable is determined by reviewing the six factors set forth in Goldberger: "(1) the time and labor expended by counsel; (2) the magnitude and complexities of the litigation; (3) the risk of the

---

[5]Under the "lodestar" method of calculating fees, counsel submits an accounting of hours multiplied by the attorneys' normal hourly rate. This is the "lodestar" amount. Depending on the presence of various factors, such as the risk of litigation, the success achieved, and the quality of work performed, courts may apply a multiplier to the lodestar to arrive at a final appropriate fee. The Second Circuit disfavors application of the lodestar method because the "lodestar create[s] an unanticipated disincentive to early settlements, tempt[s] lawyers to run up their hours, and compel[s] district courts to engage in a gimlet-eyed review of line-item fee audits." Wal-Mart, 396 F.3d at 122 (internal quotations and citation omitted). See also In re AOL Time Warner, Inc. Sec. & "ERISA" Litig., 2006 U.S. Dist. LEXIS 78101, at *24 (S.D.N.Y. Sept. 28, 2006) (noting that "every significant Southern District opinion facing the issue since Goldberger [in 2000] has embraced the percentage approach" and citing cases).

litigation ...; (4) the quality of representation; (5) the requested fee in relation to the settlement; and (6) public policy considerations." The lodestar value then acts as a "cross check" and the hours submitted by the attorneys are reviewed but not exhaustively scrutinized. 209 F.3d at 50. A court applies the Goldberger factors to determine whether enhancement of the "lodestar" figure is warranted, in other words, whether the attorneys should receive an award greater than the hours billed multiplied by the applicable hourly rates. See, e.g., Ling v. Cantley & Sedacca, L.L.P., No. 04 Civ. 4566, 2006 U.S. Dist. LEXIS 4711 (S.D.N.Y. Feb. 8, 2006) (evaluating Goldberger factors to determine whether enhancement of lodestar figure was justified).

At the outset of this analysis, it is helpful to compare the fee request in this case with the requests made and awards granted in the settlements of the Mutual Fund Cases and the Internet Cases. Ordinarily, "fee awards should be assessed based on the unique circumstances of each case," In re Bristol-Myers Squibb Sec. Litig., 361 F.Supp.2d at 236, and it is not particularly useful to cite to percentages granted in other settlements. Here, however, the factual underpinnings and procedural posture of this Action are highly similar to those that obtained in the Mutual Fund Cases and Internet Cases. Thus, the earlier

settlements provide useful benchmarks for the Court's analysis of the <u>Goldberger</u> factors in this case.

In the settlement of the Mutual Fund Cases, counsel requested an award of fees of 28% of the settlement fund. The Court found that, given the slight risk of non-recovery in the Mutual Fund Cases, due to the massive publicity of the NYAG investigation and settlement that triggered the filing of numerous lawsuits against Merrill Lynch, as well as the rather ordinary nature of the work involved, the fee request of 28% was too high. The Court noted that, were the 28% fee request granted, counsel would obtain an award of nearly $1,200 per hour for all legal and paralegal work performed during the litigation, which was deemed exorbitant. Accordingly, the Court reduced the fee to 22.5% of the settlement. The percentage translated to a fee of approximately $9,073,804, a multiple of 1.95 of counsels' lodestar, and an hourly rate of $959, which the Court stated was a "princely rate of pay, by any standard." MF Decision, at *78.

In the settlement of the Internet Cases, counsel requested an award of 24% of the settlement fund. The Court granted the requested percentage of 24%. In awarding a slightly higher percentage than that bestowed on counsel in the settlement of the Mutual Fund Cases, the Court

acknowledged that the risk faced by counsel at the outset of the litigation of the Internet Cases was higher than that faced at the outset of the Mutual Fund Cases, because the first of the twenty consolidated Internet Cases was filed months before the NYAG's investigation became public. In addition, in awarding the higher percentage, the Court acknowledged that the discovery undertaken in the early stages of the Internet Cases was comparatively more complicated and difficult, because the documents sought by the plaintiffs were not publically available and both the NYAG and Merrill Lynch mounted resistance to disclosure. Moreover, the unusual complexity of formulating a fair plan of allocation of the settlement proceeds among twenty different classes, which required counsel in each of the twenty actions to submit briefs and conduct oral argument before a neutral arbiter, weighed in favor of a generous fee. Accordingly, the requested fee of 24% was determined to be fair and reasonable. The fee of 24% translated to a multiple of counsel's lodestar of 1.985 and to an aggregate hourly rate of $912.80, which the Court stated was "generous but reasonable." Internet Cases Decision, at *67.

Counsel have addressed each of the <u>Goldberger</u> factors. Where appropriate, I contrast the application of

each of the <u>Goldberger</u> factors in this case with its application in the Mutual Fund and Internet Cases.

*(1) Time and Labor Expended*

Plaintiffs' counsel expended a total of 2496.90 hours of legal and paraprofessional work over the course of this litigation.[6]  By contrast, counsel in the Internet Cases expended a total of 35,051 hours of work, and  counsel in the Mutual Fund Cases expended a total of 9462 hours.

Counsel state that the work in this case included: the review and analysis of "thousands of pages" of public documents; participation in "numerous meetings and conferences"; "preparing briefs"; negotiation of the proposed settlement and preparation of documents related to the settlement; development of the Plan of Allocation; responding to investors' inquiries about the settlement; and preparation of the briefs in support of this Court's approval of the settlement. (Mem. of Law in Support of Lead Counsel's Mot. for an Award of Attorney Fees and Reimbursement of Expenses ("Mem. Fees"), at 8-9.) .

---

[6]As of December 7, 2007, Lead Counsel, Berger & Montague, state that they have expended a total of 2177.90 hours.  As of December 7, 2007, Liaison Counsel, Wolf Popper, state that they have expended a total of 319.0 hours.

In contrast with the Mutual Fund Cases and the Internet Cases, counsel in this Action did not perform extensive or difficult work. Prior to reaching the proposed settlement, counsels' legal drafting consisted of drafting only the pleadings and one motion on behalf of Lead Counsel to consolidate the member cases. Further, discovery in this case was limited to the review and analysis of publically available documents and therefore "did not involve intricate disputes over privilege or other difficult legal issues nor did plaintiffs have to undertake special means to procure evidence that was hard to obtain" In Re Keyspan Corp. Sec. Litig., No. 2001-5852, 2005 U.S. Dist. LEXIS 29068, at *30 (E.D.N.Y. Aug. 25, 2005). In addition, the settlement negotiations in this case were not protracted. Finally, there is no indication that formulating the Plan of Allocation or any other provisions of the Settlement was especially difficult.

By contrast, the Mutual Fund and Internet Cases involved far more extensive motion and appellate practice. In the Mutual Fund Cases, for example, counsel prepared memoranda for: the application to be appointed lead counsel; the motion for consolidation of claims before the Judicial Panel on Multi-District Litigation; motions in opposition to the defendants' motions to dismiss in all

three of the Mutual Fund Cases; a motion for reconsideration in one of the cases; a motion for Judge Pollack's disqualification in another of the cases; and appellate briefs in two of the three cases.  In addition, the discovery undertaken in the early stages of the Internet Cases was difficult, requiring counsel to file requests for documents that were not publically available under the Freedom of Information Law and later negotiate the terms under which the NYAG would permit review of those documents.  Further, the settlement negotiations that led to agreement on key terms in the Mutual Fund Cases and Internet Cases were far more protracted than the initial negotiations that took place in this litigation.  The Plan of Allocation that was devised in the Internet Cases also was far more complicated:  requiring briefing and oral argument before a neutral arbiter in each of twenty separate actions.

In sum, given the rather ordinary nature of the work involved in this Action, and in light of the fact that far more work was expended in the prosecution of the other Actions that have been settled in this MDL, the time and labor expended by counsel in the instant case do not weigh in favor of an especially generous award of attorneys' fees.

*(2) Magnitude & Complexity*

Securities class litigation "'is notably difficult and notoriously uncertain.'" In re Sumitomo Copper Litig., 189 F.R.D. 274, 281 (S.D.N.Y. 1999) (quoting In re Michael Milken and Assoc. Sec. Litig., 150 F.R.D. 46, 53 (S.D.N.Y. 1993)). Counsel assert that the litigation of this action "was complex, zealously defended and fraught with difficult legal issues and even directly adverse legal precedent." (Mem. Fees, at 10.) In particular, counsel point to the fact that the law regarding the pleading and proof of scienter and loss causation in the context of securities fraud was unsettled at the outset of the lawsuit and continued to evolve to the plaintiffs' detriment as the litigation progressed, especially given the Second Circuit's affirmance, in Lentell, of Judge Pollack's dismissal of the class complaints on loss causation grounds. Counsel also state that they encountered difficulty in overcoming additional defenses that Merrill Lynch was likely to assert, including the defense that the alleged analyst fraud had little impact on Merrill Lynch's stock price and that the decline in stock value following the revelation of the NYAG's investigation was statistically insignificant. In addition, counsel cite the difficulty of overcoming Merrill Lynch's likely scienter and statute of limitations defenses, especially in light of the Second Circuit's affirmance of

dismissals in <u>Citigroup</u> (affirming dismissal for lack of sufficiently pleading scienter) and <u>Morgan Stanley</u> (affirming dismissal on statute of limitations grounds).

The Court agrees that "this Case is complex with difficult liability issues." <u>Levitt v. Bear Stearns & Co. (In re Sterling Foster & Co. Sec. Litig.)</u>, MDL No. 1208, 2006 U.S. Dist. LEXIS 80861, at *25 (E.D.N.Y. Oct. 31, 2006). However, although the plaintiffs faced very high, if not insurmountable, hurdles in pleading and proving their claims, the issues involved in the litigation of this Action were not particularly novel or complex when compared with some other securities class actions. <u>See</u> <u>In re Bristol-Myers Squibb Secs. Litig.</u>, 361 F. Supp. 2d 229, 234 (S.D.N.Y. 2005) (evaluating the complexity of the class action relative to other securities actions). Here, as in the Mutual Fund Cases, "[c]ounsel were not required to master a particularly difficult or novel area of law in order to prosecute plaintiffs' claims" and "the fact investigation and discovery undertaken by counsel . . . were not particularly complex." <u>Id.</u> at *45-46 (citing contrasting cases). Although plaintiffs faced difficulty in pleading and proving their legal theories, the issues confronted by the putative class, consisting among other things of pleading and proving loss causation and scienter, were not

substantially more complicated than the issues that most plaintiffs typically contend with in prosecuting securities class claims. Further, although counsel were required to familiarize themselves with developments in securities law, they were not required to master a new subject. In addition, as noted, discovery in this case was limited to the review of publically available documents, and was not complicated or extensive. Finally, at the time the parties reached settlement in this case, no formal discovery had taken place. Thus, application of the "magnitude and complexity" factor does not weigh in favor of particularly generous fees in this case.

*(3) Risks of Litigation*

Courts of this Circuit have recognized the risk of litigation to be "perhaps the foremost factor to be considered in determining" the award of appropriate attorneys' fees. In re Elan Sec. Litig., 385 F. Supp. 2d 363, 374 (S.D.N.Y. 2005) (internal quotations and citation omitted). In general there is only a very small risk of non-recovery in a securities class action. See Dreyfus Aggressive Growth Mutual Fund Litigation, No. 98 CV4318, 2001 U.S. Dist. LEXIS 8418, 2001 WL 709262, at *4 (S.D.N.Y. June 22, 2001) ("What empirical data does exist indicates that all but a small percentage of class actions settle,

thereby guaranteeing counsel payment of fees and minimizing the risks associated with contingency fee litigation.") (citing S. Rep. No. 104-98, at 9 (1995) (estimating that about 300 securities lawsuits are filed each year and that 93% of these cases reach settlements.)

Counsel argue that the litigation was "undertaken from the outset on a wholly contingent basis despite the very real possibility that the plaintiff Class might not prevail and thus that counsel would receive nothing for their efforts." (Mem. Fees, at 13.) Counsel completely ignore this Court's relevant analysis in the Mutual Fund Cases, however, where it was observed that "[c]ourts of this Circuit recognize that, where claims were precipitated by public events, the risk undertaken by class counsel is especially slight." MF Decision, at *45 (citing cases where courts have found risk factor to be minimal in light of parallel or antecedent governmental investigations). This Action, like the Mutual Fund Cases, was brought in the context of the NYAG's highly publicized investigation of Merrill Lynch's misconduct. The analysis that was applied in that prior settlement is equally trenchant here:

> [T]he prospect of recovery was promising from the outset. These Actions stemmed from the highly publicized NYAG's investigation into the alleged undisclosed conflict of interest between Merrill Lynch's underwriting and brokerage arms. As Judge Pollack observed, the class

actions brought against Merrill Lynch, including the
instant Actions, were filed in the context of an
"overwhelming and widely dispersed collection of press
articles and public speeches by top securities regulatory
officials exposing the flaws in the business practices
complained of." In re Merrill Lynch & Co. Research
Reports Sec. Litig., 289 F. Supp. 2d at 419.
Specifically, the present Actions were commenced after
the NYAG had announced to great public fanfare its
ongoing investigation into Merrill Lynch's investment
banking practices and, shortly thereafter, the
unprecedented settlement reached between the NYAG and
Merrill Lynch, in which the latter agreed to pay a $100
million civil penalty and reform its investment
counseling practices. As a result of the settlement and
the enormous public attention it garnered, as the Second
Circuit noted in Lentell, "[w]ithin weeks, some 140
class-action complaints were filed" against Merrill Lynch
and related defendants. Lentell, 396 F.3d at 164.
Clearly, class counsel undertook these Actions with the
expectation of a promising resolution, given the
publicity generated by the NYAG's investigation and
settlement, and the pressure brought to bear upon the
defendants as a result of those events. . . . The lack of
risk faced by counsel at the outset of the case is born
out by the fact that the defendants settled these Actions
after Judge Pollack's with-prejudice dismissal of the
complaints in [two of the three Mutual Fund Cases] and
after the Circuit's decision in Lentell. . . . Defendants
thus faced imminent victory without having to expend
significant resources and the plaintiffs were on the
verge of being shut out of court.  That the Settlement
was reached while the case was in such a posture clearly
owes much to the pressure placed on the defendants by the
government investigation and is indicative of the low
level of risk that counsel faced in undertaking this
litigation.

MF Decision, at *49-50 (citation omitted).

The prospects for recovery were no less rosy in

this case.  In fact, the class probably faced even less of a

risk of non-recovery in this Action:  as a matter of public

relations, Merrill Lynch was more likely to arrive at a

favorable settlement with its own shareholders than with

43

direct purchasers of other securities or with purchasers of
Merrill Lynch's proprietary mutual funds.  Thus, here, as in
the Mutual Fund Cases, the "risk of litigation" factor
weighs against a high-percentage award of attorneys' fees.

*(4) Quality of Representation*

To evaluate the "quality of the representation,"
courts review the recovery obtained and the backgrounds of
the lawyers involved in the lawsuit.  See In re Global
Crossing Sec. & ERISA Litig., 225 F.R.D. at 467.  "The
quality of opposing counsel is also important in evaluating
the quality of Class Counsels' work." In re KeySpan Corp.
Sec. Litig., 2005 U.S. Dist. LEXIS 29068, at *35 (citing
Warner Communications Sec. Litig., 618 F. Supp. 735, 749
(S.D.N.Y. 1985)).

Here, as noted, counsel obtained a favorable
recovery for the class despite the great likelihood of non-
recovery in the event that the litigation continued.  Thus,
the recovery obtained constitutes an excellent result for
the class.

The backgrounds of counsel also demonstrate that
the class received high quality representation.  The firm
resumes for Lead Counsel and Liaison Counsel, as well as the
Court's familiarity with this Action, establish that the
putative class received excellent representation from firms

with wide experience in the field of complex class action securities litigation. Similarly, Merrill Lynch was represented skillfully by Skadden, Arps, Slate, Meagher & Flom, and Foley & Lardner, firms of national repute.

Thus, the quality of representation in this case certainly does not militate against the award of a generous fee.

*(5) Requested Fee in Relation to Settlement*

Counsel offer four reasons why the requested fee of 22.5% is reasonable. First, counsel state that the Lead Plaintiff, J. Marvin Brown, has approved the requested fee. Counsel argue that, in light of Lead Plaintiff's endorsement, the requested fee should be presumed to be reasonable. Second, counsel argue that the fee is reasonable when compared to "other similarly complex cases." (Mem. Fees. at 16). Specifically, counsel cite to this Court's award of a 22.5% fee in the Mutual Fund Cases and a 24% fee in the Internet Cases. Third, counsel point to the fact that the fee request comports with the terms of the Notice, which stated that counsel could seek a fee of up to 22.5% of the Settlement Fund. Finally, counsel note that, when Merrill Lynch's payment of approximately $975,000 for cost of Notice is factored into the Settlement Fund,

counsels' request translates to 21.5%, rather than 22.5%, of the Fund.

Regarding Lead Plaintiff's endorsement of the fee, counsel cite <u>In re Global Crossing Sec. & ERISA Litig.</u>, 225 F.R.D. at 466 for the proposition that "in class action cases under the PSLRA, courts presume fee requests submitted pursuant to a retainer agreement negotiated at arm's length between lead plaintiff and lead counsel are reasonable."  In <u>Global Crossing</u>, however, the court went on to state that the reasonableness of counsel's fee request could be presumed, in light of lead plaintiff's approval, because

> Lead Counsel's application is based on a sliding scale set in a retainer agreement by sophisticated Lead Plaintiffs operating under the oversight of the Ohio Attorney General.  The retainer agreement was negotiated at arm's length before this litigation commenced, when each party operated behind a veil of ignorance regarding how the case would ultimately fare. Moreover, the contingent nature of the recovery, negotiated by the client, served to minimize agency problems by giving counsel an incentive to seek the largest recovery possible.

<u>Id.</u>  Similarly, in <u>In re Worldcom, Inc. Sec. Litig.</u>, Judge Cote observed that the prior endorsement by the lead plaintiff, a large public pension fund, of class counsels' application for a percentage of the settlement is entitled to "great weight" when "class counsel in a securities lawsuit have negotiated an arm's-length agreement with a <u>sophisticated lead plaintiff possessing a large stake in the litigation, and when that lead plaintiff endorses the</u>

application following close supervision of the litigation."
388 F. Supp. 2d at 353 (emphasis added). Here, although
Lead Plaintiff states in his declaration that he has
conferred with Lead Counsel repeatedly about the case and
received status updates and relevant documents, there no
indication that he is a sophisticated actor who engaged in
pre-litigation negotiation with counsel regarding the fee,
that he holds a substantial stake in the lawsuit's outcome,
or that he closely supervised the litigation. Nor is there
any indication that Lead Plaintiff operated under the
oversight of any governmental body or other sophisticated
entity. In short, Lead Plaintiff's endorsement of counsels'
fee application is not sufficient to trigger the presumption
that counsels' requested percentage is reasonable and
entitled to judicial deference.

In addition, Lead Plaintiff states in his
declaration that his approval of counsels' request for 22.5%
of the settlement was based in part on his understanding
"that this was the fee which this Court awarded recently in
two sets of related cases involving Merrill Lynch (and that
the lawyers there had originally sought a higher attorney
fee.)" (Decl. of Marvin Brown ¶ 6.) As discussed at length
in this Opinion, the Goldberger factors apply differently in
this case than they applied in the Mutual Fund Cases and

Internet Cases.  In particular, the amount and difficulty
of work performed in this case was less than that performed
in the Mutual Fund and Internet Cases.  In addition,
discovery in this case was less arduous than the discovery
undertaken in the Internet Cases and the overall risk faced
at the outset of litigation was also less substantial in
this case than was faced by plaintiffs in the Mutual Fund
Cases.  Thus, the mere fact that fees of 22.5% and 24% were
awarded, respectively, in the Mutual Fund and Internet Cases
is not sufficient to justify Lead Plaintiff in his
understanding that an award of 22.5% would be reasonable in
this case.

        For similar reasons, counsels' second argument,
that the percentages awarded in this case should be based on
the percentages awarded in the prior settlements, is
unavailing.  Although a number of cases could be cited to
support or oppose the argument that a 22.5% or a 21.5% fee
in a securities class action of this size is reasonable, in
general "reference to awards in other cases is of limited
usefulness." In re KeySpan Corp. Sec. Litig., 2005 U.S.
Dist. LEXIS 29068, at *40 (citing Goldberger, 209 F.3d at
53).  This is because "fee awards should be assessed based
on the unique circumstances of each case."  In re Bristol-
Myers Squibb Secs. Litig., 361 F. Supp. 2d at 236 (citing

48

Goldberger, 209 F.3d at 52).  Despite very important similarities between this Action and the previous two Merrill Lynch settlements, there are crucial distinguishing characteristics that render an award of 22.5% inappropriate in this case.  As discussed, an award of 22.5% in the Mutual Fund Cases resulted in a per hour compensation of under $1,000, which the Court deemed fair.  Here, as discussed below, an award of 22.5% would yield an hourly rate of pay of approximately $1,420 for every hour worked in this litigation.  Quite simply, in light of the relevant facts of this litigation, this is an unreasonable amount. Based on this "cross-check" alone, the requested fee is not reasonable in relation to the settlement.

Counsels' two additional arguments – that the fee requested comports with the Notice and that the fee should actually be considered as a request for 21.5% rather than 22.5 % of the Fund – do not weigh in favor of a finding that the fee requested is reasonable.  Counsels' compliance with the Notice is not sufficient for the Court to find the requested fee reasonable.  The fact that the requested fee could be deemed to be 21.5%, in light of the defendants' payment of the expenses and costs related to notice and claims administration, is also insufficient to justify the

requested fee as reasonable.[7]  As the caselaw makes clear,
the reasonableness of class counsels' request for fees is
determined not simply by looking at the percentage figure
requested, but by evaluating the <u>Goldberger</u> factors and
performing the lodestar cross-check to ensure that counsel
are adequately compensated but not overcompensated for their
work.

*(6) Public Policy*

    Public policy concerns favor the award of
reasonable attorneys' fees in class action securities
litigation. <u>See</u> <u>In re WorldCom, Inc. Sec. Litig.</u>, 388 F.
Supp. 2d at 359.  Here, as discussed below, the requested
fee of 22.5% translates to an aggregate hourly rate of $1420
for each hour of work performed by counsel and paralegals in
this action.  Although an award of fees from a common fund
is intended to provide class counsel with proper incentive
to bring actions that would otherwise not be prosecuted, an
award bestowing a windfall of $1420 per hour, in a case
where the risk of non-recovery was slight and counsel did
not perform particularly difficult or extensive work, is in

---

[7]I note that, even if the percentage requested by counsel is
deemed to be 21.5%, the resulting award would be approximately
$3,386,957, which in turn translates to an aggregate fee of
approximately $1,356 for every hour of work performed in this
case, which is not meaningfully less exorbitant than the hourly
rate of $1,420 that is bestowed by an award of 22.5%.

excess of what is needed to provide adequate incentive.
Thus, public policy concerns do not militate in favor of the
fee that counsel seeks.

*Lodestar Cross-Check*

Even where a court employs the percentage method
of fee calculation, documentation of hours remains a useful
"cross-check" on the reasonableness of the requested
percentage of the settlement fund. <u>Goldberger</u>, 209 F.3d at
50.

Here, as of December 7, 2007, counsel expended
2496.9 hours during the litigation for total billed charges,
or a "lodestar", of $1,169,359.50. The lodestar in this
case represents an aggregate hourly rate of $468.33. As
stated above, the 22.5% fee requested by counsel translates
to an award of $3,544,490, which amounts to a multiplier of
approximately 3.03 of counsels' lodestar.

Unlike the Mutual Fund Cases and Internet Cases,
where a sizeable percentage of the work was performed by
individuals charging at a rate of more than $500/hour, in
this case the large majority of the work was performed by
personnel who charged rates of between $300 and $500/hour.
Here, as in the previous settled cases, counsel claim that,
to the extent the Court finds that senior personnel
participated heavily in the litigation, such participation

was required, because the bulk of the work involved the drafting of complicated pleadings and conducting extensive settlement negotiations. Counsel also contend that the rates charged by the individual attorneys for Lead Counsel and Liaison Counsel conform with the rates charged by attorneys performing similar work in the community. Berger & Montague's time records indicate that attorneys charged hourly rates ranging from $300 to $700. Wolf Popper's time records indicate that partners billed at hourly rates of $570 to $675, and associates billed at rates of $350 to $450. These rates conform with rates that are deemed reasonable in class action securities litigation. See In re Independent Energy Holdings PLC Sec. Litig., No. 00 Civ. 6689, 2003 U.S. Dist. LEXIS 17090, at *30 (S.D.N.Y. Sept. 26, 2003) (noting that rates of $650/hour for partners and $300-$425/hour for associates were "not extraordinary for a top-flight New York City law firm"). Thus, the delegation of work and the hourly rates billed by firm personnel in this case appear reasonable.

The 22.5% fee that counsel have requested translates to a multiple of 3.03 of the aggregate lodestar.[8]

---

[8]At the Fairness Hearing, Lead Counsel represented that, after accounting for the additional hours of work that counsel expected to expend in relation to the administration of the Settlement, after the date of the Fairness Hearing, the effective lodestar multiplier would be 2.5. Counsel miscalculated the

Counsel cite a number of cases in which courts of this Circuit have awarded fees that are in excess of three times counsels' aggregate lodestar. Nevertheless, it must be stated again that fee statistics from other factually dissimilar, common fund cases are of little moment. Counsel conspicuously fail to address this Court's lodestar "cross-check" in the Mutual Fund Cases, where the Court refused to award what counsel in that settlement characterized as a "modest" lodestar multiplier of 2.43:

> [A]n award that equates to a multiplier of 2.43 of the lodestar is excessive. Counsel characterize this multiplier as "modest," (Mem. Fees 30), and cite to several cases from the Second Circuit in which the percentage fee awarded represented multipliers in the range of 2.09 to 4.65. Counsel also cite to this Court's 1985 decision, in <u>Warner Communications Sec. Litig.</u>, 618 F. Supp. at 749, decided 15 years before <u>Goldberger</u>, for the proposition that multipliers in the range of 3.0 to 4.5 are common. Counsel are correct that courts in the Southern District have approved percentage fee awards that represented multipliers of greater than 2. [citing cases] However, contrary to counsels' assertion that "[t]he range of multipliers has not changed since . . . <u>Warner Communications</u>," (Mem. Fees 31), as a rule, "post-<u>Goldberger</u> courts . . . have generally refused multipliers as high as 2.03." <u>In re Twinlab Corp. Sec. Litig.</u>, 187 F. Supp. 2d at 87. <u>See also</u> <u>In re Arakis Energy</u>, 2001 U.S. Dist. LEXIS 19873, at *51 (stating that

---

multiplier. Counsel appear not to have taken into account the fact that the percentage awarded is applied not only to the base Settlement amount of $15 million, but also to the interest that has accrued and will continue to accrue until the Settlement is approved and the Fund distributed. In other words, the correct calculation of the lodestar multiple requires dividing counsels' lodestar into the total amount of the Settlement Fund (that is, the base amount plus the accrued interest), not merely dividing the lodestar into the base amount of $15 million.

an award that was equivalent to a 1.2 multiplier would
not "deviate materially from post-<u>Goldberger</u> decisions of
courts within the Second Circuit as to whether or not to
apply a multiplier to a given lodestar").

MF Decision at *65-66.  The lodestar multiplier of

approximately 3.03 that counsel request in this case runs

counter to the trend among "post-<u>Goldberger</u>" courts to

refuse to award lodestar multipliers of greater than 2.0.

The inadvisability of awarding a percentage that

results in bestowing a fee of more than three times

counsels' lodestar is born out by examining the effective

hourly rate of pay that counsel would receive for its work

in this case if the Court were to grant the award that

counsel has requested.  In cross-checking the requested

percentage against the lodestar, the Court must "confirm

that the percentage amount does not award counsel an

exorbitant hourly rate." <u>In re Bristol-Meyers Squibb Sec.</u>

<u>Litig.</u>, 361 F. Supp. 2d at 233 (citing <u>In re NASDAO Market-</u>

<u>Makers Antitrust Litig.</u>, 187 F.R.D. 465, 486, 489 n.24

(S.D.N.Y.1998) (internal citations omitted)).  In the Mutual

Fund Cases, it was noted that, were the Court to award the

requested 28% fee, "the effective rate for the work

performed by both lawyers and paraprofessionals in these

Actions will be $1,193.51 per hour", a rate which was aptly

characterized as "exorbitant." MF Decision, at *67.

Accordingly, the Court reduced the requested fee percentage,

54

to 22.5% of the settlement fund in that case, so that the award resulted in a lodestar multiplier of 1.95 and an aggregate hourly compensation of $959.

Here, the requested percentage translates to a rate of compensation of approximately $1,420 for each hour of work expended in this case. Clearly, if an hourly rate of $1,193 was "exorbitant" in the Mutual Fund Cases, where counsel performed more extensive labor, then an award translating to an hourly pay rate of approximately $1,420 in this Action is excessive.

Thus, the lodestar cross-check does not support the requested award; rather, the cross-check suggests that the percentage awarded should be reduced to conform with the award granted in the Mutual Fund Cases, namely a rate of hourly compensation that is closer to a multiple of 2.0 of the aggregate lodestar and results in compensation of less than $1,000 per hour.

*Objection to Requested Fees*

There has been only one objection to attorneys' fees:_____

_____*Brian Maule*:  Mr. Maule appears to object on the basis of his mistaken impression that counsel are requesting more than 22.5% of the Settlement Fund.  As counsel point

out, Mr. Maule requests the Court to "reduce" fees to "the originally indicated 22.5% [in the Notice]. . . ."

Clearly, counsel are not requesting more than 22.5% of the settlement. Counsel hae submitted to the Court a copy of a letter to Mr. Maule that clarifies the situation. In any event, Mr. Maule's objection is without merit and does not factor into the Court's determination of a fair and reasonable fee.

*Reasonable Fee Award*

After applying the Goldberger factors and considering counsels' aggregate lodestar, the Court finds that an award of 15% of the Settlement Fund constitutes a reasonable fee. This award will result in a fee of approximately $2,362,993 as of December 7, 2007, which equates to a reasonable lodestar multiplier of approximately 2.02 and an impressive but not exorbitant hourly rate of pay of approximately $946. I note that both the multiple of counsels' lodestar and the resultant hourly rate of pay that counsel will receive in this Action are higher than the lodestar multiple and hourly rate that counsel received in the Mutual Fund Cases and Internet Cases.

**(IV) Reimbursement of Litigation Expenses**

Counsel request reimbursement of $78,653.43 in litigation costs and expenses. Counsel is entitled to

reimbursement from the common fund for reasonable litigation expenses. <u>Miltland Raleigh-Durham v. Myers</u>, 840 F. Supp. 235, 239 (S.D.N.Y. 1993) (quoting <u>Reichman v. Bonsignore, Brignati & Mazzotta, P.C.</u>, 818 F.2d 278, 283 (2d Cir. 1987)).

Counsels' application is for an amount less than that stated in the Notice, which provided that the request for reimbursement of expenses would not exceed $125,000. Both Lead Counsel and Liaison Counsel have submitted line-item accountings of expenses incurred during the litigation. The expenses for which counsel seek reimbursement were billed at cost and included typical litigation costs, such as consulting fees, computer research, reproduction costs, travel, and telephone. As counsel note, the largest line item expense consisted of payment of the consulting fees for the plaintiffs' damages expert. No Class Members have objected to the expenses claimed. The expenses submitted by counsel are reasonable and should be reimbursed in full out of the Settlement Fund. In addition, counsel are permitted to petition the Court for reimbursement of any additional reasonable litigation costs and expenses as they are incurred in this Action.

**CONCLUSION**

For the foregoing reasons, the Court grants
certification to the settlement classes and approves the
Settlement and Plan of Allocation as fair and reasonable.
Plaintiffs' remaining claims are dismissed with prejudice.
Counsel are awarded attorneys' fees in the amount of 15% of
the Settlement Fund and reimbursement of costs and expenses
in the amount of $78,653.43.

The Court will enter an Order and Final Judgment,
to be submitted by counsel, confirming and finalizing its
approval of the Settlement and its award of fees and
reimbursement of expenses consistent with all of the
proceedings in this case and this Opinion and Order.
Attorneys' fees and expenses are to be administered pursuant
to the terms of the Order and Final Judgment.

SO ORDERED.

Dated: New York, New York
       December **19**, 2007

John F. Keenan

JOHN F. KEENAN
United States District Judge